**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua B. Glatt (State Bar No. 354064)
Ines Diaz Villafana (State Bar No. 354099)
Karen B. Valenzuela (State Bar No. 357231)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
jglatt@bursor.com
idiaz@bursor.com
kvalenzuela@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RYAN MOORE, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WILD PLANET FOODS, INC.,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Ryan Moore ("Plaintiff") brings this action on behalf of himself, and all others similarly situated against Defendant Wild Planet Foods, Inc. ("Defendant" or "Wild Planet"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

**NATURE OF THE ACTION**

1. Plaintiff brings this class action lawsuit on behalf of himself, and all others similarly situated who purchased Defendant's Wild Planet Wild Sardines in Extra Virgin Olive Oil—Lightly Smoked (the "Product"),[1] which is unfit for consumption because—according to third party testing—it contains, or risks containing, arsenic levels that pose an unreasonable safety hazard. The Product is formulated, designed, manufactured, advertised, sold, and distributed by Defendant or its agents to consumers, including Plaintiff, across California and the United States.

2. Indeed, despite Defendant's claims that the Product is "Wildly Good For You" and a "Nutritional Powerhouse," testing of Defendant's Wild Planet Wild Sardines in Extra Virgin Olive Oil—Lightly Smoked found that the Product contained 221 micrograms ("mcg") of arsenic per 85 grams of the product.[2] Further, because the serving size for Defendant's Product is 85 grams, consumers are unknowingly consuming 221 mcg of arsenic per serving (the full can). For reference, the threshold set by California's Proposition 65 for exposure to arsenic that does not cause a significant cancer risk is 10 mcg per day.[3, 4]

3. Arsenic poses a serious health risk to consumer health, affecting a number of vital

[1] Discovery may reveal that additional of Defendant's products are within the scope of this Complaint. Accordingly, Plaintiff reserves the right to include additional items identified through the course of discovery.

[2] Tod Cooperman, *Canned Tuna, Salmon, Sardines & Mackerel Review: Find Fish With the Least Mercury & Arsenic and Most Omega-3s*, ConsumerLab, https://www.consumerlab.com/reviews/canned-tuna-salmon-sardines-mackerel-herring-review/canned-tuna-and-salmon/?search=arsenic#related-product-updates (last updated April 6, 2026).

[3] *Arsenic*, State of California Office of Environmental Health Hazard Assessment, https://oehha.ca.gov/chemicals/arsenic (last accessed Aug. 18, 2026).

[4] This Complaint does not allege a violation of Proposition 65.

systems and organs,[5] especially in regularly consumed foods like Defendant's Product.

4. Accordingly, Plaintiff brings claims against Defendant individually and on behalf of Classes of all others similarly situated for (1) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (3) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (4) Breach of Express Warranty; and (5) Unjust Enrichment.

## PARTIES

5. Plaintiff Ryan Moore is a citizen of California who resides in Napa, California. Plaintiff purchased the Product as recently as June 2025 from a Costco store in Napa, California. Plaintiff regularly consumed the Product, eating the suggested serving size on the package, *i.e.*, 85 grams, as often as two to three times per week. Prior to purchasing the Product, Plaintiff reviewed the Product's packaging and labeling, which did not disclose that the Product contains, or risks containing, significant levels of dangerous arsenic. Plaintiff viewed the representations and warranties on the packaging, which state that the Product is a "Nutritional Powerhouse" and that the Product is "Wildly Good for You," prior to purchase and reasonably understood that the Product was safe and suitable for consumption as intended. Accordingly, Plaintiff relied on these representations, and Defendant's omission of the fact that the Product contained arsenic, in deciding to purchase the Product and consume it regularly. As such, those representations and omissions were part of the basis of the bargain. In making his purchase, Plaintiff paid a price premium due to Defendant's misleading marketing that the Product is safe for consumption despite the presence (or risk thereof) of arsenic in the Product. Had Plaintiff known that the Product contained, or risked containing arsenic in alarming quantities, and therefore was not safe for regular consumption, Plaintiff would not have purchased the Product or would have purchased it under substantially different terms. Plaintiff did not receive the benefit of his bargain because the

[5] *Arsenic*, National Institute of Environmental Health Sciences, https://www.niehs.nih.gov/health/topics/agents/arsenic#:~:text=Introduction,health%20effects%20are%20more%20severe (last updated March 6, 2026).

Product was not, in fact, safe for use as intended because of the inclusion (or risk thereof) of arsenic.

6. Plaintiff remains interested in purchasing the Product from Defendant. However, he is unable to determine if the Product is actually safe for consumption. He understands that the composition of the Product may change over time, but as long as Defendant continues to represent the Product as being suitable for consumption, when presented with false or misleading information while shopping, he will be unable to make informed decisions about whether to purchase the Product and will be unable to evaluate the different prices between Defendant's Product and competitors' products. Plaintiff is further likely to be repeatedly misled by Defendant, unless and until Defendant is compelled to ensure that the Product's marketing, labeling, and packaging as a safe food source are in fact true.

7. Defendant Wild Planet Foods, Inc. is a Delaware corporation with its principal place of business in McKinleyville, California. Defendant Wild Planet markets, sells, and distributes the Product throughout the contiguous United States, including in California. During the relevant period, Defendant Wild Planet controlled the manufacture, design, testing, packaging, labeling, marketing, advertising, promotion, distribution, and sales of its Product. Defendant Wild Planet therefore had complete control over how to label its Product as to its contents.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005 ("CAFA"), because there are more than 100 Class Members, the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and at least one Class Member is a citizen of a state different from Defendant.

9. This Court has general jurisdiction over Defendant because Defendant is at home in this District and because a substantial portion of the events giving rise to Plaintiff's claims occurred in this District.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is at home in this District, transacts significant business within this District, and Plaintiff resides in

this District where a substantial part of the events giving rise to his claims took place.

## FACTUAL ALLEGATIONS

### I. Arsenic and its Effects on the Body

11. Arsenic is a heavy metal. Arsenic occurs naturally in the environment as an element of the earth's crust; it is found in rocks, soil, water, air, plants, and animals. Elemental arsenic is combined with other elements like oxygen, chlorine, and sulfur to form inorganic arsenic compounds.

12. Arsenic is dangerous to humans, especially when ingested. "Arsenic is ranked first among toxicants posing a significant potential threat to human health based on known or suspected toxicity."[6] However, the effects of arsenic in the body are not immediately experienced. Often, arsenic in food accumulates in the body through the course of repeated ingestion, where long term exposure is linked to cardiovascular disease, strokes, and diabetes. Arsenic affects a broad range of organs and systems including, endocrine system, immune system, nervous system, prostate glands, and respiratory system.[7] Additionally, in utero and early childhood exposure have been linked to negative impacts on cognitive development and increased deaths in young adults.[8] Some studies have suggested that arsenic may cause IQ deficits in children and may be harmful to fetal development as "[s]tudies have shown that even low concentrations of arsenic impair neurological function[.][9] Exposure to high levels of arsenic during times of active brain development is associated with adverse neurological effects such as learning disabilities, behavior difficulties, and

---

[6] Christina R. Tyler and Andrea M. Allan, *The Effects of Arsenic Exposure on Neurological and Cognitive Dysfunction in Human and Rodent Studies: A Review*, CURR ENVIRON HEALTH REP. 2014; 1(2): 132-147, https://pmc.ncbi.nlm.nih.gov/articles/PMC4026128/.

[7] *Arsenic*, National Institute of Environmental Health Sciences, https://www.niehs.nih.gov/health/topics/agents/arsenic#:~:text=Introduction,health%20effects%20are%20more%20severe (last updated March 6, 2026).

[8] *Arsenic*, World Health Organization, https://www.who.int/news-room/fact-sheets/detail/arsenic (last accessed Aug. 18, 2026).

[9] Christina R. Tyler and Andrea M. Allan, *The Effects of Arsenic Exposure on Neurological and Cognitive Dysfunction in Human and Rodent Studies: A Review*, Curr Environ Health Rep. 2014; 1(2): 132-147, https://pmc.ncbi.nlm.nih.gov/articles/PMC4026128/.

lowered IQ.[10] Fetuses, infants, and children are particularly vulnerable to the potential harmful effects from arsenic exposure because of their smaller body sizes, rapid metabolism, and growth.

13. Arsenic toxicity is relative, and the absorption of arsenic can be influenced by factors such as its concentration, an individual's nutrition habits, the duration of the exposure, and the relationship of arsenic with other substances in the environment.[11]

14. There is "essentially no safe level" of arsenic.[12] Even low levels of exposure to arsenic and the resulting health effects are reason for concern for scientists, pediatricians, and public health professionals.[13] Researchers have learned that both short-term and long-term exposure to arsenic can cause health problems.[14]

15. Short-term exposure to very high levels of arsenic can cause gastrointestinal discomfort, muscle cramping, weakness, skin rash, tingling or pain in hands and feet, and loss of movement and sensory responses.[15]

16. All arsenic is toxic to humans and can affect people of any age or health status.[16] However, arsenic is highly toxic in its inorganic form and its associated health effects are more

---

[10] *Arsenic in Food*, United States Food and Drug Administration, https://www.fda.gov/food/environmental-contaminants-food/arsenic-food (last updated March 5, 2024).

[11] Tiamon Francis Moran Hoyne, et al., *Arsenic speciation in canned tuna fish samples (Thunnus) using ionic chromatography inductively couples plasma mass spectrometry*, J. of Food Comp. and Analysis, V.116 (Mar. 2023). https://www.sciencedirect.com/science/article/abs/pii/S088915752200669X

[12] David Heath, *What to do if your drinking water contains arsenic?* The Center for Public Integrity (June 28, 2014), https://publicintegrity.org/environment/what-to-do-if-your-drinking-water-contains-arsenic/.

[13] *Arsenic*, National Institute of Environmental Health Sciences, https://www.niehs.nih.gov/health/topics/agents/arsenic#:~:text=Introduction,health%20effects%20are%20more%20severe (last updated March 6, 2026).

[14] *Id.*

[15] Tod Cooperman, *Canned Tuna, Salmon, Sardines & Mackerel Review: Find Fish With the Least Mercury & Arsenic and Most Omega-3s*, ConsumerLab, https://www.consumerlab.com/reviews/canned-tuna-salmon-sardines-mackerel-herring-review/canned-tuna-and-salmon/?search=arsenic#related-product-updates (last updated April 6, 2026).

[16] *Arsenic*, National Institute of Environmental Health Sciences, https://www.niehs.nih.gov/health/topics/agents/arsenic#:~:text=Introduction,health%20effects%20are%20more%20severe (last updated March 6, 2026).

severe than organic arsenic.[17] For people of all ages, short-term exposure to very high amounts of inorganic arsenic can result in nausea, vomiting, bruising, and numbness or burning sensations in the hands and feet.[18]

17. Other symptoms from exposure to inorganic arsenic include skin thickening and discoloration, decreased blood cell production, and abnormal heart rhythms.[19]

18. It is estimated that approximately 10% of the arsenic in fish is the more toxic, inorganic form of arsenic.[20] Further, researchers speculate that "some of the organic arsenic in these fish might be biotransformed to inorganic forms within the body"[21] thus eliminating any material differences between the forms and their corresponding harms. While arsenic is a naturally occurring element, because of the adverse health effects associated with arsenic exposure, Defendant nonetheless had a duty to disclose the presence or potential presence of arsenic in its Product.

**II. Defendant's Wild Planet Brand**

19. Defendant owns and operates its seafood brand Wild Planet. Wild Planet prides itself on its "high-quality ingredients" and "abundant care" placed in its fishing practices to keep "its products as pristine and wholesome as possible."[22]

Wild Planet-branded products range from canned sardines, tuna, salmon, mackerel, yellowtail, anchovies, chicken, pouched beef, and ready-to-eat-meals.

---

[17] *Arsenic*, World Health Organization (Dec. 7, 2022), https://www.who.int/news-room/fact-sheets/detail/arsenic.

[18] *Id.*

[19] *Arsenic in Drinking Water*, Health Canada, https://www.canada.ca/en/health-canada/services/healthy-living/your-health/environment/arsenic-drinking-water.html (last updated Oct. 28, 2025).

[20] Tod Cooperman, *Canned Tuna, Salmon, Sardines & Mackerel Review: Find Fish With the Least Mercury & Arsenic and Most Omega-3s*, ConsumerLab, https://www.consumerlab.com/reviews/canned-tuna-salmon-sardines-mackerel-herring-review/canned-tuna-and-salmon/?search=arsenic#related-product-updates (last updated April 6, 2026).

[21] *Id.*

[22] *Wild Planet Nutrition*, Wild Planet, https://wildplanetfoods.com/pages/nutrition-facts (last accessed March 5, 2026).

20. At issue here are Defendant's Wild Planet Wild Sardines in Extra Virgin Olive Oil—Lightly Smoked:







**III. Defendant's Product Contains Toxic Arsenic**

21. In October 2025, independent third-party testing by ConsumerLab (an organization that tests consumer product claims) tested Defendant's Wild Planet Wild Sardines in Extra Virgin Olive Oil—Lightly Smoked and found the Product to contain 221 mcg of arsenic per 85 grams of the Product. ConsumerLab's independent testing analyzed by Inductively Coupled Plasma-Mass Spectroscopy (ICP-MS) total arsenic and inorganic arsenic concentrations exceeding 3.5 parts per

million ("ppm").[23] According to ConsumerLab, testing was performed by more than one independent laboratory, where any product that did not initially pass a test was sent to another independent laboratory to repeat testing for criteria on which it did not pass, *i.e.*, arsenic levels exceeding 3.5 ppm.[24] The identities of the products were not disclosed to laboratories performing the testing and the products were purchased on the open market.[25]

22. As a reference, Proposition 65 establishes 10 mcg of arsenic per day as a safe harbor.[26] ConsumerLab testing found 221 mcg arsenic per 85 grams of Defendant's Product or 2.6 mcg per gram.[27] However, the serving size for Defendant's Product is 85 grams, meaning consumers are unknowingly consuming 221 mcg of arsenic whenever they eat a full serving of Defendant's Product. Based on estimates suggesting that 10% of arsenic in fish may be inorganic, if consumers ingested 85 grams of Defendant's sardines in one sitting, they would be exposed to levels of arsenic in excess of California's daily safe harbor (10% of 221 mcg of arsenic = 22.1 mcg of arsenic). Moreover, there is no established safety level of arsenic, only estimated maximum tolerable limits.

23. Therefore, the levels of arsenic ConsumerLab's testing found in the Products pose a risk to consumers' health as any level of arsenic, especially inorganic arsenic, is unhealthy. The levels of arsenic found in the Products are even more alarming for Defendant's Product as it is marketed to be consumed on a regular basis. As such, Defendant had a duty to disclose that its Product leads to, or risks, potential adverse health effects due to the levels of arsenic and inorganic arsenic present.

---

[23] Mark L. Anderson, *Canned Tuna, Salmon, Sardines & Mackerel Review: How Products Were Evaluated*, ConsumerLab, https://www.consumerlab.com/methods/canned-tuna-salmon-sardines-mackerel-herring-review/canned-tuna-and-salmon/ (last accessed Aug. 18, 2026).

[24] *Id.*

[25] *Id.*

[26] *Arsenic*, State of California Office of Environmental Health Hazard Assessment, https://oehha.ca.gov/chemicals/arsenic (last accessed Aug. 18, 2026).

[27] Tod Cooperman, *Canned Tuna, Salmon, Sardines & Mackerel Review: Find Fish With the Least Mercury & Arsenic and Most Omega-3s*, ConsumerLab, https://www.consumerlab.com/reviews/canned-tuna-salmon-sardines-mackerel-herring-review/canned-tuna-and-salmon/?search=arsenic#related-product-updates (last updated April 6, 2026).

24. ConsumerLab also tested other brands of sardines and found them to contain less than Defendant's 221 mcg of arsenic per serving, suggesting that the levels of arsenic found in Defendant's Product are not attributable solely to the species of fish used in the Product, and that the amount of arsenic could be reduced through processing or refinement techniques.

**IV. Fish Eating Habits and Consumer Expectations**

25. Due to consumers' desire to eat healthy, and well-known health benefits of eating fish (*e.g.*, protein and heart-healthy Omega-3 sources), consumers are turning to fish as part of a healthy, well-balanced diet.[28] Indeed, the U.S. Food & Drug Administration ("FDA") recommends that adults consume *at least* 8 ounces (approximately 227 grams) of fish *per week* and children consume 2-8 ounces (approximately 57-227 grams) of fish *per week* depending on age.[29] For those who might become or are pregnant or breastfeeding, the FDA lists sardines as a "Best Choice" fish option and suggests eating 2-3 servings of sardines a week.[30]

26. Sardines are touted for their high protein and omega-3 content.[31] This makes them an appealing option for consumers who want to maintain a balanced diet for health.[32] The American Heart Association also recommends sardines for their omega-3 fatty acid content.[33] Defendant even notes on its website that sardines are "nutritional powerhouses [that]

---

[28] *Benefits and Risks of Eating Fish*, State of California Office of Environmental Health Hazard Assessment, https://oehha.ca.gov/fish/benefits-and-risks-eating-fish (last accessed Aug. 17, 2026).

[29] *Advice about Eating Fish*, U.S. Food & Drug Administration, https://www.fda.gov/food/consumers/advice-about-eating-fish#:~:text=and%20rectal%20cancers*-,The%20Dietary%20Guidelines%20for%20Americans%20recommends%20eating%20fish%20as%20part,the%20%E2%80%9CBest%20Choices%E2%80%9D%20list (last accessed Aug. 17, 2026).

[30] *Advice About Eating Fish*, FDA, https://www.fda.gov/media/102331/download?attachment (last updated Oct. 2021).

[31] Jillian Kubala, *What Happens to Your Body When You Eat Sardines Regularly?* https://www.health.com/what-happens-to-your-body-when-you-eat-sardines-regularly-11828393 (last updated Feb. 23, 2026).

[32] *Id.*

[33] *4 Ways to Get Good Fats Infographic*, American Heart Association, https://www.heart.org/en/healthy-living/healthy-eating/eat-smart/fats/4-ways-to-get-good-fats-infographic (last updated Aug. 21, 2025).

offer…essential nutrients such as EPA and DHA Omega-3s, iron, and potassium."[34] Consumers, including Plaintiff, thus understand that sardines are a nutrient-dense food that is good for their health and understandably may opt to eat it regularly.

27. Defendant is aware that consumers may eat its Product on a daily basis and even encourages them to do so. On its FAQ section of its online Product page, Defendant explains that "it [is] okay to eat sardines every day."[35] Defendant states that "[f]or most people, eating sardines daily is perfectly fine and can be a fantastic addition to their diet. They're one of the most nutrient-dense foods you can eat: high in protein, rich in Omega-3s, and loaded with essential minerals like calcium and iron."[36] Defendant further reassures consumers that "[b]ecause sardines are small fish low on the food chain, mercury isn't a concern the way it can be with larger fish."[37]

28. Consuming canned or tinned fish is a convenient and versatile way for consumers to incorporate fish into their diets. Buying canned fish means the product is ready to eat with little to no preparation. Concurrently, consumers are increasingly aware that some fish may contain contaminants, like mercury, that may build up in their bodies over time.[38] Consumers rate chemicals as their top food safety concern according to an annual industry survey of consumer perspectives on food issues.[39] To mitigate this risk, consumers look to, and rely on, product labels that disclose warnings for risky and unwanted chemicals in the food they are purchasing.

29. While it may be common knowledge for some consumers to limit their overall seafood intake due to high mercury levels in certain fish, the same is not true for arsenic in seafood.

---

[34] *Sardines*, Wild Planet Foods, https://wildplanetfoods.com/collections/sardines (last accessed March 5, 2026).

[35] *Wild Sardines In Extra Virgin Olive Oil*, Wild Planet Foods, https://wildplanetfoods.com/products/wild-planet-sardines#nutrition (last accessed March 5, 2026).

[36] *Id.*

[37] *Id.*

[38] *Advice about Eating Fish*, U.S. Food & Drug Administration, https://www.fda.gov/food/consumers/advice-about-eating-fish#:~:text=and%20rectal%20cancers*-,The%20Dietary%20Guidelines%20for%20Americans%20recommends%20eating%20fish%20as%20part,the%20%E2%80%9CBest%20Choices%E2%80%9D%20list (last accessed Aug. 17, 2026).

[39] Tom Neltner, *Consumers Continue to Rate Chemicals In Food As A Top Food Safety Concern*, Environmental Defense Fund (Sept. 14, 2022), https://blogs.edf.org/health/2022/09/14/consumers-continue-to-rate-chemicals-in-food-as-top-food-safety-concern/.

For instance, one study that tested people in New Hampshire found that inorganic levels of arsenic were higher in those who consumed the most dark-meat fish, such as sardines. This led the researchers to speculate that "some of the organic arsenic in these fish might be biotransformed to inorganic forms within the body."[40] Thus, because consumers are unaware that certain fish species may contain arsenic, Defendant had a duty to disclose this material risk that its Product contains or risks containing arsenic, especially because inorganic arsenic is toxic at any level.

**V. Defendant's Representations and Omissions Are Actionable**

30. Defendant manufactures, markets, labels, and sells the Product in brick-and-mortar stores and online through sites like Walmart.com.

31. Nowhere on the Product packaging does Defendant mention arsenic or the risk of arsenic.

32. Instead, Defendant represents on the front of the package that the Product is a "Nutritional Powerhouse" and "Wildly Good for You," leading consumers to believe that the Product is healthy and free of any negative health risks.

33. As a result of Defendant's representations and omissions, a reasonable consumer would have no reason to suspect the presence of arsenic without conducting their own scientific tests, much less become aware of the presence of arsenic while browsing the canned fish isle.

34. Consumers understandably and justifiably rely on Defendant to be truthful regarding the Product's contents, including the presence of unhealthy, dangerous chemicals like inorganic arsenic in the Product, especially at any level.

35. Defendant knew and could not be unaware of the existence of arsenic in the Product because Defendant sources the ingredients, manufactures the Product, and has exclusive knowledge of the quality control testing on the Product and the elements contained therein. Defendant has a responsibility to implement controls to significantly minimize or prevent exposure

[40] Tod Cooperman, *Canned Tuna, Salmon, Sardines & Mackerel Review: Find Fish With the Least Mercury & Arsenic and Most Omega-3s*, ConsumerLab, https://www.consumerlab.com/reviews/canned-tuna-salmon-sardines-mackerel-herring-review/canned-tuna-and-salmon/?search=arsenic#related-product-updates (last updated April 6, 2026).

to hazardous chemicals in the Product and to disclose their presence therein.

36. Additionally, Defendant knew or should have been aware that a reasonable consumer would consume the Product consistent with the serving suggested on the packaging and would consume it multiple times per week, especially given the positive "healthy" associations of fish rich in Omega-3s and nutrients, like sardines, and the specific health-related representations on the packaging of the Product. This leads to repeated exposure to arsenic.

37. The presence, or risk thereof, of arsenic in food products, particularly any level of inorganic arsenic, is unquestionably material to reasonable consumers, because arsenic poses serious health risks, even at low levels. This is particularly true for food products that are consumed and suggested to be consumed, on a regular basis, like Defendant's Product.

38. Defendant is also best positioned to know of the presence of arsenic in its Product and failed to disclose the existence, or risk of existence, of arsenic in the Product to consumers.

39. Plaintiff and those similarly situated (the "Class Members") relied on Defendant's representations that the Product was healthy and otherwise safe to be consumed regularly in full amounts. Plaintiff and Class Members likewise had no reason to suspect that Defendant was omitting the Product contained dangerous chemicals when purchasing the Product. Had they known the truth about Defendant's Product contents, Plaintiff and all others similarly situated would not have purchased the Product or would have paid less than they did for it. Plaintiff and Class Members bargained for foods that were free of harmful toxins and were deprived of the basis of their bargain when Defendant sold them a Product containing arsenic, especially any level of inorganic arsenic.

40. No reasonable consumer would expect that their sardines would pose a risk to health, safety, and well-being by containing arsenic linked to harmful health effects, especially any level of inorganic arsenic. Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Product.

41. Moreover, because these facts relate to a critical safety-related deficiency in the Product, Defendant was under a continuous duty to disclose to Plaintiff and Class Members the true standard, quality, and grade of the Product and to disclose that the Product may contain

substances known to have adverse health effects. Defendant, as manufacturer or party to a contract to manufacture, thereby providing and approving designs of the Product, and as seller and advertiser of the Product, is best situated to know the contents of the Product. Nonetheless, Defendant concealed the true nature of the Product, as discussed herein. Despite Defendant's knowledge of arsenic in the Product, Defendant failed to provide any warning on the Product's packaging or label that the Product contains arsenic, especially any level of inorganic arsenic.

42. Defendant had a duty to disclose that the Product contained, or risked containing, arsenic because of both the dangerous nature of the heavy metal and because of its exclusive and/or superior knowledge concerning the true nature and composition of the Product as the owner, manufacturer, producer, marketer, and seller of the Product. Nonetheless, Defendant concealed this material information.

## FEDERAL RULE OF CIVIL PROCEDURE 9(b) ALLEGATIONS

43. Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

44. **WHO**: Defendant Wild Planet Foods, Inc.

45. **WHAT**: Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Product contains—or risks containing—any levels of inorganic arsenic, which is widely known to have significant adverse health repercussions. Defendant also represented that the Product was healthy by stating the Product is a "Nutritional Powerhouse" and "Wildly Good for You," on the Product packaging. Thus, Defendant's conduct deceived Plaintiff and the members of the Classes into believing that the Product was safe for use despite the inclusion (or risk of) harmful chemicals. Defendant knew, or reasonably should have known, that this information is material to reasonable consumers, including Plaintiff and the members of the Classes when they make their purchasing decisions, yet Defendant continued to pervasively and affirmatively warrant and represent that the Product was of a quality and character that it is not.

46. **WHEN**: Defendant made material representations and omissions during the putative class period, including prior to and at the time of Plaintiff's and the Class Members' purchases, despite Defendant's knowing—or reasonably should have known—the risk that the Product contained, or risked containing, arsenic.

47. **WHERE**: Defendant's representations and omissions were made on the labeling and packaging of the Product and were thus viewed and relied on by every purchaser, including Plaintiff, at the point of sale in every transaction. The Product is sold in brick-and-mortar stores and online stores nationwide.

48. **HOW**: Defendant omitted from the Product's labeling the fact that the Product contains (or risks containing) arsenic, especially any level of inorganic arsenic, and instead represented that the Product is healthy. And as discussed in detail throughout this Complaint, Plaintiff and Class Members read and relied on Defendant's label and packaging omissions before purchasing the Product.

49. **WHY**: Defendant omitted from the Product's labeling the fact that it contains (or risks containing) arsenic, especially any level of inorganic arsenic, and represented that the Product is healthy, for the express purpose of inducing Plaintiff and Class Members to purchase the Product at a price premium or more than they would have paid had they known the truth about the Product. As such, Defendant profited by selling the Product to at least thousands of consumers throughout the nation, including Plaintiff and the Class Members.

50. **INJURY**: Plaintiff and the members of the Classes purchased, and paid a premium or otherwise paid more for, the Product they otherwise would not have—had they known that the Product contained, or risked containing, toxic arsenic.

## CLASS ACTION ALLEGATIONS

51. Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23. The class definition(s) may depend on the information obtained throughout discovery. Notwithstanding, at this time, Plaintiff brings this action and seeks certification of the following proposed classes (collectively, the "Classes"):

> ***Nationwide Class.*** All persons in the United States who purchased the Product for personal or household use during the statute of limitations period.

52. Plaintiff also brings this action on behalf of the following State Subclass:

> ***California Subclass.*** All persons in the State of California who purchased the Product for personal or household use during the statute of limitations period.

53. Excluded from the proposed Classes are: (1) persons who made such purchases for the purpose of resale; (2) any Judge or Magistrate presiding over this action and any members of their families; (3) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiff's counsel and Defendant's counsel.

54. Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

55. Plaintiff further reserves the right to amend the above class definition as appropriate after further investigation and discovery, including by seeking to certify a narrower multi-state class (or classes) in lieu of a nationwide class if appropriate.

56. ***Numerosity.*** At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclass ("Class Members" or "Subclass Members"). However, given the nature of the claims, Plaintiff believes that Class and Subclass Members are so numerous that joinder of all members is impracticable. While the exact number of Class members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands, of putative Class members. Moreover, the number of Members of the Classes may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by mail and/or electronic mail or other appropriate digital means, which can be supplemented if deemed necessary or appropriate by the Court with published notice.

57. ***Existence and Predominance of Common Questions of Law and Fact.*** This action involves common questions of law and fact, which predominate over any questions affecting

individual members of the Classes. These common legal and factual questions include, but are not limited to, the following:

a. Whether the Product contained arsenic;

b. Whether a reasonable consumer would understand Defendant's marketing and packaging to mean that the Product would be free of harmful, toxic chemicals like arsenic;

c. Whether Defendant had a duty to disclose the presence of arsenic in its Product;

d. Whether Defendant's conduct was unlawful, unfair, and/or deceptive;

e. Whether Plaintiff and members of the Classes are entitled to injunctive and other equitable relief;

f. Whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class members;

g. Whether Plaintiff and the Classes are entitled to restitution and disgorgement from Defendant; and

h. Whether Plaintiff and the Classes have sustained monetary loss and the proper measure of that loss.

58. ***Typicality.*** Plaintiff's claims are typical of the claims of the Classes in that Plaintiff, like all Members of the Classes, purchased the Product in reliance on Defendant's representations and omissions, in which Defendant represented the Product as being healthy and failed to disclose the Product contains or risks containing arsenic, especially any level of inorganic arsenic. Plaintiff and Members of the Classes suffered a loss as a result of the purchases and so were injured by Defendant's misconduct in the very same way. In other words, the factual bases of Defendant's misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

59. ***Adequacy.*** Plaintiff will fairly and adequately protect the interests of the Members of the Classes. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interests to those of the Classes.

60. ***Superiority.*** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual litigation of their claims against Defendant. It would, thus, be virtually impossible for Members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

## CAUSES OF ACTION

### COUNT I

**Violation of California's Consumer Legal Remedies Act, ("CLRA")**
**Cal. Civ. Code §§ 1750, *et seq.***
**(On Behalf of the Nationwide Class and California Subclass)**

61. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

62. Plaintiff brings this claim individually and on behalf of the Nationwide Class and California Subclass against Defendant.

63. Plaintiff and other Members of the Classes are "consumers" within the meaning of California Civil Code § 1761(d). By purchasing Defendant's Product, Plaintiff and the Classes engaged in "transactions" within the meaning of Cal. Civ. Code §§ 1761(e) and 1770.

64. Defendant is a "person" within the meaning of Cal. Civ. Code § 1761(c). Defendant's Product is a "good" within the meaning of Cal. Civ. Code § 1761(a).

65. Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…"

66. Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that the goods are of a particular style or model, if they are

of another."

67. Civil Code § 1770(a)(9) prohibits "advertising goods … with the intent not to sell them as advertised."

68. Defendant violated Civil Code §§ 1770(a)(5), (a)(7), and (a)(9) by Defendant's failure to disclose that the Product contains or risked containing arsenic, especially any level of inorganic arsenic.

69. Defendant had exclusive knowledge and/or superior knowledge of the health risks of the Product, which was not known to Plaintiff or the Classes.

70. Defendant's wrongful business practices constituted, and still constitute, a continuing course of conduct in violation of the CLRA.

71. Plaintiff and the Classes have suffered economic injury as a direct and proximate result of Defendant's violation of the CLRA because: (a) they would not have purchased the Product on the same terms if they had known that the Product contained or risked containing arsenic, especially any level of inorganic arsenic; (b) they paid a price premium compared to products without the omission alleged herein; and (c) the Product did not have the characteristics, ingredients, uses, benefits, or qualities as promised.

72. On or about November 17, 2025, prior to the filing of this complaint, Defendant received a CLRA notice letter via certified mail, with return receipt requested, which complies in all material respects with California Civil Code § 1782(a). The letter advised Defendant that it was in violation of the CLRA with respect to the presence of arsenic in the Product and demanded that it cease and desist from such violations and make full restitution by refunding the monies received therefrom. The letter stated that it was sent on behalf of all other similarly situated purchasers. Defendant failed to remedy the issues raised by the notice letter.

73. Pursuant to Civ. Code § 1780, Plaintiff and the Classes seek: (a) actual damages in an amount to be determined at trial; (b) an order enjoining Defendant from continuing its violative acts and practices; (c) restitution of all money and property lost by Plaintiff and the members of the Classes as a result of Defendant's unlawful conduct; (d) punitive damages; (e) any other relief that the Court deems proper; and (f) attorneys' costs and fees.

**COUNT II**
**Violation of California's Unfair Competition Law, ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of the Nationwide Class and California Subclass)**

74. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

75. Plaintiff brings this claim individually and on behalf of the Nationwide and California Subclass against Defendant in the alternative to the extent allowed by Fed. R. Civ. P. 8(d)(2).

76. California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice." A business act or practice is "unlawful" if it violates any established state or federal law. A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Cal. Bus. & Prof. Code § 17204. Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by unlawful and/or unfair business practices or acts.

77. For the reasons discussed above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code §§ 17200, *et seq*.

78. Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** by violating the CLRA, Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9) as well as by violating California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*. in addition to violations of common law.

79. In addition, as described more fully above, Defendant's misleading marketing, advertising, packaging, and labeling of its Product is likely to deceive reasonable consumers. In addition, Defendant has committed unlawful business practices by, *inter alia*, making the omission of material facts, as set forth more fully above, thereby violating the common law.

80. Defendant has also violated the UCL's prohibition against engaging in **Unfair Business Practices.** Defendant's acts, omissions, misrepresentations, practices, and

nondisclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, as the conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

81. There were reasonably available alternatives to further Defendant's legitimate business interest, other than the conduct described above.

82. Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices.** Defendant's claims, nondisclosures, and misleading statements with respect to the Product as more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of Bus. & Prof. Code § 17200.

83. Plaintiff and the members of the Classes suffered a substantial injury by virtue of buying the Product that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the inclusion of harmful toxins in the Product.

84. There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Product.

85. Plaintiff and the Members of the Classes had no way of reasonably knowing that the Product they purchased was not marketed, advertised, packaged, or labeled in conformity with Defendant's representations. Thus, they could not have reasonably avoided the injury each of them suffered.

86. The gravity of the consequences of Defendant's conduct, as described above, outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives that exist in the marketplace. Such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other Members of the Classes.

87. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and the Classes seek an order of this Court that includes, but is not limited to, requiring Defendant to (a) provide restitution to

Plaintiff and the other Class Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff's attorneys' fees and costs.

**COUNT III**
**Violation of California's False Advertising Law, ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(On Behalf of the Nationwide Class and California Subclass)**

88. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

89. Plaintiff brings this claim individually and on behalf of the Nationwide Class and California Subclass against Defendant in the alternative to the extent allowed by Fed. R. Civ. P. 8(d)(2).

90. The FAL makes it "unlawful for any person … to make or disseminate or cause to be made or disseminated before the public in this state, … [in] any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or those services, professional or otherwise, or … performance or disposition thereof, which is untrue or misleading and which is known, or which by exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

91. Defendant's acts and practices, as described herein, have deceived, and are likely to continue to deceive, members of the Nationwide Class, California Subclass, and the public. As described throughout this Complaint, Defendant failed to disclose the presence of harmful arsenic in its Product, thereby giving the impression to reasonable consumers that the Product is safe to use as intended. However, the Product is not, in fact, safe to consume as it contains, or risks containing, arsenic, especially any level of inorganic arsenic.

92. By its actions, Defendant disseminated uniform advertising regarding the Product to and across California and the United States. The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code §§ 17500, *et seq.* Such advertisements were intended to and likely did deceive the consuming public.

93. The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the

Product contains—or risks containing—substances that pose a significant risk to consumers' health.

94. In making and disseminating these omissions, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law. Plaintiff and the Members of the Classes based their purchasing decisions on Defendant's omitted material facts. The revenue attributable to the Product sold in those false and misleading advertisements likely amounts to millions of dollars. Plaintiff and the Members of the Classes were injured in fact and lost money and property as a result.

95. The misrepresentation and non-disclosures by Defendant and the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

96. As a result of Defendant's wrongful conduct, Plaintiff and the Members of the Classes lost money in an amount to be proven at trial. Plaintiff and the Members of the Classes are therefore entitled to restitution as appropriate for this cause of action.

97. Plaintiff and the Classes therefore seek (a) all monetary and non-monetary restitution allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; (b) declaratory relief; (c) reasonable attorneys' fees and costs under California Code of Civ. Proc. 1021.5; (d) injunctive relief, and other appropriate equitable relief.

98. Plaintiff lacks an adequate remedy at law to address the unfair conduct at issue here. Legal remedies available to the Members of the Classes are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

99. Equitable relief is also appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Product is determined to be an amount less than the premium price of the Product. Without compensation for the full premium

price of the Product, Plaintiff and the Members of the Classes would be left without the parity in purchasing power to which they are entitled.

**COUNT IV**
**Breach of Express Warranty**
**(On Behalf of the Nationwide Class and California Subclass)**

100. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

101. Plaintiff brings this claim individually and on behalf of the Nationwide Class and California Subclass under the laws of California.

102. Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Product, a foodstuff, expressly warranted that the Product was fit for consumption. Due to the presence of arsenic, especially any level of inorganic arsenic, the Product, however, lacks the most basic degree of fitness for this ordinary use. The Product is unsafe for consumption as it is contaminated with arsenic, especially any level of inorganic arsenic.

103. Defendant has breached its warranty implied in the contract for the sale of the Product. As a result, Plaintiff and the members of the Classes did not receive the goods as expressly warranted by Defendant to be merchantable.

104. Plaintiff and the members of the Classes purchased the Product in reliance upon Defendant's skill and judgment and the express warranties of fitness for the purpose.

105. The Product was mislabeled when it left Defendant's exclusive control.

106. Plaintiff and the Members of the Classes did not receive the goods as warranted.

107. As a direct and proximate cause of Defendant's breach of its express warranty, Plaintiff and the Classes have been economically injured because (i) they would not have purchased Defendant's Product on the same terms if they knew that the Product contained arsenic, especially any level of inorganic arsenic; and (ii) the Product does not have the characteristics, uses, or benefits as promised by Defendant.

108. On or about November 17, 2025, prior to the filing of this complaint, Defendant received a pre-suit notice letter via certified mail, with return receipt requested, which complies in all material respects with U.C.C. Sections 2-313 and 2-607. The letter advised Defendant that it

breached its warranty with respect to the presence of arsenic in the Product and demanded that it cease and desist from such breaches and make full restitution by refunding the monies received therefrom. The letter stated that it was sent on behalf of all other similarly situated purchasers.

109. As a result of Defendant's breach of express warranty, Plaintiff and each member of the Classes suffered financial damage and injury as a result and are entitled to damages, in addition to costs, interest and fees, and attorneys' fees, as allowed by law.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class)**

110. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

111. Plaintiff brings this claim individually and on behalf of the Nationwide Class and California Subclass under the laws of California.

112. To the extent required by the law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8(d)(2).

113. Plaintiff brings this claim under the laws of the State of California.

114. Plaintiff and the Nationwide Class conferred benefits on Defendant by purchasing the Product.

115. Defendant voluntarily accepted and retained this benefit.

116. Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and the Nationwide Class members' purchases of the Product. Retention of those monies under these circumstances is unjust and inequitable because Defendant failed to disclose that the Product contained—or risked containing—toxic substances, which constitutes false and misleading advertisements. These omissions caused injuries to Plaintiff and the members of the Nationwide Class because they would not have purchased the Product had they known that the Product contained or risked containing toxic arsenic.

117. Because this benefit was obtained unlawfully, namely by selling and accepting compensation for a Product containing or risking containing arsenic, especially any level of inorganic arsenic, it would be unjust and inequitable for Defendant to retain it without paying the

value thereof. Accordingly, Plaintiff and Members of the Nationwide Class seek restitution as ordered by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Class and Subclass, and Plaintiff's attorneys as Class Counsel;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in the amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated: August 18, 2026

**BURSOR & FISHER, P.A.**

By: *___/s/ L. Timothy Fisher___*
L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Joshua B. Glatt (State Bar No. 354064)
Ines Diaz Villafana (State Bar No. 354099)
Karen B. Valenzuela (State Bar No. 357231)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596

Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
jglatt@bursor.com
idiaz@bursor.com
kvalenzuela@bursor.com

*Attorneys for Plaintiff*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1. I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court. I am a Partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Ryan Moore. Plaintiff alleges he is a resident of Napa, California. I have personal knowledge of the facts set forth in this declaration and if called as a witness, I could and would competently testify to thereto under oath.

2. The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California, as Plaintiff Moore alleges he purchased the Product in this District. Additionally, Defendant advertised, marketed, manufactured, distributed, and/or sold the Product at issue to Class Members in this District.

3. I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Walnut Creek, California on August 18, 2026.

*/s/ L. Timothy Fisher*
L. Timothy Fisher